UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA

v. 23 CR 161(MAD)

SENTENCE

DIONISIO FIGUEROA,

Defendant.

------------------------------------x

United States Courthouse
White Plains, N.Y.
April 8, 2024

Before: THE HONORABLE MAE A. D'AGOSTINO, District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
STEPHANIE SIMON
FRANK BALSAMELLO
Assistant United States Attorneys

PAUL EVANGELISTA
JEREMY SPORN
Attorneys for Defendant

THE DEPUTY CLERK: The Honorable Mae A. D'Agostino now presiding.

THE COURT: Be seated, everyone.

THE DEPUTY CLERK: Today is Monday, April 8th, 2024. The time is 11:52 a.m. The case is United States of America v. Dionisio Figueroa, case number 23 CR 161.

We're here today for a sentencing hearing.

May we have appearances for the record, please.

MR. BALSAMELLO: Good morning, your Honor.

Frank Balsamello and Stephanie Simon for the United States.

THE COURT: Good morning.

MR. EVANGELISTA: Paul Evangelista and Jeremy Sporn for Mr. Figueroa, who is present.

Good morning, Judge.

THE COURT: All right. Good morning to all of you.

Do both counsel have the final presentence report dated February 1st, 2024 and the addendum dated February 26th, 2024?

MR. BALSAMELLO: We do, your Honor.

MR. EVANGELISTA: Yes, Judge.

THE COURT: And Mr. Evangelista, have you shared these reports with Mr. Figueroa?

MR. EVANGELISTA: Yes, your Honor.

THE COURT: Thank you.

The record should reflect that the Court has reviewed and considered all of the pertinent information in this case, including, but not limited to, those presentence investigation reports that I just referenced; all submissions by counsel; the 2023 Edition of the Sentencing Guidelines Manual; and the factors outlined in 18, United States Code, Section 3553(a).

The Court adopts the factual information and the guideline applications contained in the presentence investigation report.

The Court finds the total offense level is 22, the criminal history category is I, and the guideline imprisonment range is 41 to 51 months.

The Court has also carefully reviewed letters from a number of people. I will state the names of the individuals who have sent the letters. If I mispronounce the names, I apologize in advance.

Francisco Celedonio, Esquire; Debra Freeman, Esquire; Jennifer Brown, Esquire; Deidre von Dornum, AFPD; Zachary Margulis-Ohnuma, Esquire; Megan Bennett, Esquire; Lisa Scolari, Esquire; Sarah Kunstler, Esquire; Neil Checkman, Esquire; Avrom Robin, Esquire; John Burke, Esquire; Kelly Sharkey, Esquire; Michael Sporn, Esquire; and Louis Freeman, Esquire.

Does the government have any objection to the facts, the offense-level calculation or criminal history set forth in the PSR?

MR. BALSAMELLO: No, your Honor.

THE COURT: Does the defense have any objections?

MR. EVANGELISTA: Yes, Judge. I think we've listed those in our objections to the report as well as in our briefing.

Judge, the two main objections are to the loss amount that has been calculated and the enhancement for obstruction of justice that has been calculated.

THE COURT: Okay. Thank you.

On the loss amount, what does the government have to say in response to the defense objection?

MR. BALSAMELLO: Your Honor, as set forth in our submission, we believe that the evidence adduced at trial, including both the documentary records that plainly show the amounts of money referred as well as a very fair and, if anything, conservative extrapolation from a number of referrals that occurred, that the total is at least $40,000.

THE COURT: All right.

Mr. Evangelista, do you want to add anything to that? I did carefully read the sentencing memo where you interposed the objection.

MR. EVANGELISTA: Judge, just briefly.

Judge, there doesn't seem to be a pattern to the payments here. There were 40 referrals contained in the documented evidence that the government presented during trial.

There were somewhere around 20 retentions as a result of those referrals and those very documents show actual payments to total $8,000. To get to the numbers the government is relying on, you have to look at the testimony of Ms. Silva, and for the reasons that came out during her cross, she was testifying under a proffer agreement, she was testifying under a nonprosecution agreement. We don't believe that her testimony is supported by the documented evidence and, for those reasons, we -- let me go back.

The government did point out email 701-E-16, a thousand dollars, 502J and 502N, 2K. The total is $8,000, which is incorporated into the number of times that Ms. Martha went to see the Del Valle office. The total that we've come up with, Judge, is somewhere less than $15,000, as we've calculated in our brief. So we feel like that's a more appropriate loss amount, especially in light of the requirement that the Court not engage in speculation. United States v. Deutsch, 987 F.2d 878, a Second Circuit case.

Thank you, Judge.

THE COURT: Okay. Well, on the loss amount, of course, no one even during the trial was able to compute the exact amount. The transfer of money in this case between Mr. Del Valle and Mr. Figueroa is the stuff that movies are made of. What we learned was that money was being stashed in envelopes; that Mr. Figueroa's significant other would come to

the office, get the envelopes stuffed with money. I listened to testimony that she would make the sign of the cross and then she would leave. We know that sometimes there were thousands of dollars stuffed into the envelopes. I know that this case involved approximately 40 referrals. I know that it went on for 10 years, approximately 10 years.

Based upon the testimony of the witnesses with respect to the amount of cash that was in the envelopes, the number of referrals, it's not pure guessing. It's not pure conjecture. I think that the numbers would bear out something greater than $40,000 and probably less than $90,000. And in cases such as this, the surreptitious manner in which the money is being exchanged prevents an exact accounting because neither Mr. Del Valle or Mr. Figueroa were about to keep a ledger of every single payment that was made.

So, under the circumstances, I do believe that Probation has appropriately scored this level for the amount of money that I do believe was involved from listening to the trial testimony.

As far as the obstruction, the two-point enhancement for the obstruction of justice, I believe that that is appropriately applied in this case. I listened, as did everyone else in the courtroom, to the recordings of Mr. Figueroa when the government agents reminded him that they were government agents and that he did have to tell the truth

and he, Mr. Figueroa, clearly said, in words or substance, I never did anything like that; I would never take money from an attorney; I don't do that; I didn't do that. And that was false. And there's no question from listening to the audio at the time of trial that he did willfully and falsely give information to the officers who were asking him questions. That is very clear.

So, as I said, the six-level enhancement will apply for a loss of greater than $40,000, but less than $90,000, and also the two-point enhancement for obstruction of justice.

Is there anything that the government would like to say before I impose sentence?

MR. BALSAMELLO: Yes, your Honor. And I'll be brief because our submissions capture the full extent of our views here, but we believe that a guidelines sentence of 41 to 51 months is sufficient, but not greater than necessary to accomplish the goals of sentencing here.

First, as your Honor well knows from the trial, the offense conduct is extraordinarily serious. Mr. Figueroa breached the Court's trust. And it's always an egregious bit of conduct for someone to breach the trust of an employer, but, here, where it is an institution, a government institution that executes the entire justice system, where attorneys and judges come to find truth, to reach just outcomes, for any employee of that system to taint a step in its process is a serious breach

of trust and it threatens the integrity of the system.

There were defendants who qualified for free court-appointed attorneys who, instead of accepting those attorneys, heard Mr. Figueroa speak ill of public defenders or court-appointed counsel and then went and sought out Mr. Del Valle and paid him, in some instances, tens of thousands of dollars thinking that they had gotten some sort of inside court endorsement when, in fact, they were getting a recommendation from someone who stood to financially gain himself if they hired that attorney. It was straight self-interest. That was what Mr. Figueroa served by recommending those people.

We heard testimony from a witness who said that, right, they were concerned with the attorney in Puerto Rico, but we also heard I believe it was Ms. Duverge who had said she raised no concern about their court-appointed lawyer. In fact, they stayed with the court-appointed lawyer, who represented her boyfriend successfully through the case and, yet, Mr. Figueroa had still pitched her on going to Mr. Del Valle.

So we agree with one aspect of the way defense counsel characterizes Mr. Figueroa. He was a face of the Court. He was the person at the window who defendants and their families would see when they came and he exploited that. That was a position of trust he was in and he used it to enrich himself. For that reason, the seriousness of the conduct we

believe necessitates a guidelines sentence.

General deterrence also requires one. This is, as your Honor noted, the sort of conduct that is very difficult to detect. It occurs between two people by phone amongst themselves with some cash in an envelope. There's not an enormous trail. There's not a huge number of people who would have known about it. And so it's important for a message to go to court employees and government employees generally that if they abuse their positions this way, they'll face serious consequences.

Finally, the last point I'll make is about Mr. Figueroa and the need for specific deterrence and personal characteristics that have been shown through this entire process.

It's almost hard to imagine how a defendant could be more opposite than Mr. Del Valle was, and the Court just sentenced Mr. Del Valle, in terms of contrition and acceptance of responsibility. At no point has there been any indication that Mr. Figueroa recognizes what he did was wrong. He has insisted to his supervisors in the court, to the agents, at every opportunity when he would speak that he didn't even do these things, much less appreciate why they were wrong. And so we believe that that lack of acceptance of responsibility and the need for specific and general deterrence weigh in favor of the guidelines sentence as calculated by Probation.

Unless the Court has any questions, we would rest on our submissions.

THE COURT: No questions. Thank you.

For the defense, Mr. Evangelista.

MR. EVANGELISTA: Judge, just one point on the obstruction that we would like to make and then move into the 3553(a) factors.

The obstruction requires more than just a false statement, Judge, of materiality. It requires that the statement significantly impede the investigation. And as we recognized here and in our brief, we don't feel like that occurred here. I appreciate and accept the Court's ruling on that and I'll move on to the 3553(a) factors.

Judge, we couldn't agree more than Mr. Del Valle and Mr. Figueroa are opposites. All you have to do is look in the courtroom and see how many of the family members of Mr. Figueroa are here or are still alive and I think everyone here is court personnel or attorneys. You couldn't look further than the level of education. You couldn't look -- they're opposite in every way.

The government says it in their memo. Mr. Del Valle corrupted a court employee. Mr. Figueroa was acting as he always acted. The two witnesses from the Court, the countless letters that have been submitted to the Court all show that Mr. Figueroa's personality is to help people. Louder than

life. Bigger than life. Always willing to do the extra shifts. AUSAs, CJA, FPD, private counsel, defendants, their families, his co-workers. That was his instinct. And as we put in our memo, and we thank the Court for accepting the over-page-limit memo, we see why. Because that's how he was raised.

This started as, in Mr. Figueroa's head, helping people. And it really did. And where it ended was someplace that it should never have went. When he was offered or given money for those first cases, he should have turned it down and he didn't.

Acceptance of responsibility, Judge, is not -- Mr. Figueroa has no obligation -- to just address the government's last point -- no obligation to plead guilty. And that's not a lack of remorse because he didn't plead guilty. He has a constitutional right to go to trial. That's what he did. He conducted himself in this courtroom with a complete respect for the Court and recognizes the government has a job to do. We hope the Court doesn't impose a penalty for Mr. Figueroa exercising his right to trial.

He doesn't get acceptance of responsibility, but he does offer his version of how this came into being, Judge, and that was from a good heart, convincing himself that a lawyer that you -- you read the letters. You just had a sentencing for him. Who was a phenomenal person. No explanation as to

why he would take advantage of Mr. Figueroa. But that's who Mr. Figueroa saw, the guy that was on the Grievance Committee, the guy that was the President of the Spanish Bar Association, the guy that he saw perform in court with Spanish-speaking people that he wanted to help. And the overwhelming majority of the people that were involved in this case do appear to have spoken Spanish, Judge.

The other thing he is not accepting responsibility for is that he was disparaging CJA or Federal Defenders. Karol Duverge said that. No other witness came in here and said that, Judge. In fact, everyone -- all the letters that we submitted from people that were in the system, in the Southern District of New York, never heard him disparage any counsel in any way, only acting helpful in and out of the courtroom.

Yes, we've had the benefit of sitting through the prior sentencing, Judge, so we know your feelings on the seriousness of the offense, but we would suggest to the Court that there was a significant imbalance here and that, while the offense is serious, Mr. Figueroa's and the other factors that the Court has to consider outweigh the need for a jail sentence here.

Judge, adequate deterrence. Let me talk about for Dionisio specifically. He lost everything. Lost his job. Lost his court friends. Lost his reputation. Lost his salary. Lost his ability to feel good about himself for helping people.

Thousands and thousands of cases came through that office, Judge. Forty of them in the course of a decade were referred. He's 67. He'll never be employed by the courts again. We don't feel like specific deterrence is necessary here, Judge.

Judge, general deterrence is also satisfied by a non-jail sentence. I will venture to say that there's not a single clerk or a single attorney in the Southern District of New York or the surrounding areas that is going to say, well, Mr. Figueroa didn't get a jail sentence here, so it's going to be -- better take a chance on seeing if we can get away with a bribery scheme. A jail sentence isn't going to move the ball on general deterrence an inch.

Losing everything that you stood for and having it be public, having get arrested -- despite your co-defendant getting to turn himself in, get arrested outside of your home and spend seven hours in lockup in front of people that you worked with, that was intentional because it sent a message. Don't do this. As was every press release that the government issued in this case. Don't do this. Here's what the corruption group at the Southern District of New York will do to you no matter who you are. Message received, Judge, loud and clear. And there's not a single reason that a jail sentence is necessary to generally deter in this case.

Judge, to protect the public from future crimes of Mr. Figueroa, we think that factor falls to the defense side of

the equation. He's 67 years old. I think Probation recognizes that future crimes are not a concern for the Court here. Mr. Figueroa is never going to work for the Court again. It's a crime that occurred because of the position he held and he's not going to have that kind of interaction with public. He's being punished for holding that position as a public officer. His guidelines are obviously higher than what Mr. Del Valle's were for those reasons.

Judge, the crime -- well, let me move forward.

Judge, I think there are some odd disparities in the general objection we have to the guidelines in that the loss calculation here -- how is Del Valle's loss calculation $40,000 to $95,000 and Dionisio's loss calculation is the same? Del Valle, as the government presented in their sentencing argument, a very conservative $5,000 per case puts him at $115,000. That's another couple levels higher under the guidelines. We understand that there's some ease in calculating his guidelines by the amount of payments he made to Mr. Figueroa, but the guidelines seem to suggest that the amount he gained from his illegal bribes is the higher number and that's what the guidelines suggest should apply. How they wind up giving him a lower number when, in our position, he's more culpable than Mr. Del Valle is is an example of how the guidelines are not a good fit for this type of non-heartland case that's not necessarily driven by the gain amount, but by

what the government has presented over and over in their papers is the damage to the Court.

On that, Judge, we would note that there has not been any -- the government suggests that the letters we've submitted only show a part of the opinion of the employees of the Southern District. There isn't a single letter from anyone suggesting otherwise. And no one was restricted. The government had the ability to gain support for their allegations on damage to the Court and it hasn't been provided.

Judge, with regard to the restitution, the government isn't seeking restitution.

With regard to the forfeiture amount, Judge, we do object to the forfeiture amount of $40,000. If anything, the forfeiture amount of $15,000 or below is what we are seeking as appropriate based on the evidence in the case.

And, Judge, for all the reasons that we cited in our memo and all the reasons in the letters of support filed with the Court, we are seeking a non-jail sentence with supervision, community service.

Thank you, Judge.

THE COURT: All right. Thank you.

Mr. Figueroa, do you wish to say anything before I impose sentence?

THE DEFENDANT: Good morning.

I'm going to say to you, since I was a kid, I was

brought up helping people, taking care of people. Never got in trouble. I worked in that courthouse for more than 21 years. Nobody point a finger at me. Always helping people. By helping people, I thought I was doing the right thing. At the end, I did the wrong thing. I lost my job. I hurt the Court. I hurt my family. I hurt everybody. Even me, for me.

I did refer people, help people at the window. I help them because the way they desperate, but I never talk to them again. I never know if they pay Del Valle, how much money they pay Del Valle. I never gave my personal phone number. That never happened, my personal phone number. I never even talk to the mother, the defendant's mother.

THE COURT: Slow down a little bit.

THE DEFENDANT: I never even talk to the defendant's mother. I talk to the defendant's brother. That was the one that handle that. And this is what I told him. And God know I'm telling you the truth. I told him --

THE COURT: What was your last statement?

THE DEFENDANT: I say God know I'm telling you the truth, because I told him, listen -- I gave Mr. Del Valle's contact information. Not to her, to him, even though she was at the window. I told him if Mr. Del Valle help you out, you don't have to pay a single payment. I also told him that he -- they don't like to keep such a lawyer. And the last thing I told him, I say, listen, if you decide to hire him, tell him

that he know me, to lower the price. Does that sound like doing business? I thought I help them. I help them. I never talk to them in my life. I don't know where they live. I never had any contact with them. Nothing. I'm not --

And I'm really sorry for what I did from the bottom of my heart. I destroyed my career. I destroyed my life. All my family and friends depend on me, my son, my grandson. My grandson is 17 years old. He's in college. I love my mother, my family. I take care of all of them. And to come here, I mean, treated like a criminal? I did something wrong, as I said to you, and I am sorry for doing that, but I wasn't doing the thing that they say I did. Every person that went to that window, in 21 years, nobody came to the window (INDISCERNIBLE), not even a single complaint.

And I'm telling you you don't know what I'm going through, the nightmare I'm living with. Everything. I'm done. I'm going to be 68 years old in December. In December. I can't get a job with the Court. I'm not going to get a job, I mean, anything that related to public service, something like that. But because the way I was brought up, the way I always like to help people, I am going to find me a way to a senior citizen place or to a community service to continue helping people, because I'm going to die helping people.

I never hurt anyone verbally, physically, abuse. I never humiliate anyone. I treat every single one same. I

treat people that clean the court the same way I treat the Chief District Judge. Because they all different. I only have respect for people because that was the way I was brought up. (INDISCERNIBLE) teach me that. That's the only thing. That's what I got to tell you. Because, I mean, every single one, every people in the courthouse, they could talk about me. Right? I'm a person loud, always joking around.

If I see that you -- if you think -- I mean, there's no way in the world that if I walk behind you -- behind any person or in front of any person and I see that person fall that I'm going to continue to walk. I'm going to try to help you. If something happen across the street, I see something happen to you, I cross the street and go help you. I see you with pain that you can't walk, I feel sad because I see you are in pain. Because that's me. I give my arm. Here, hold it. Come on. Let me help you. I do that every day. Every day of my life. I walk to the Bronx alone, to Brooklyn, Queens, everywhere by myself. I go through the projects. People, they say, hey, brother, how you doing? Thank you for helping me. Oh. I say who are you? Oh, the Court. I say you know so many people that work for the Court? Oh, no. You helping with my family. No one. Entire city.

But, as I said to you before, thinking that I was doing the right thing, helping people, at the end, I was wrong. And I'm sorry I hurt the Court. I hurt myself and my family

that depend on me and every single person around me.

And I thank you, God, for giving me these two wonderful people that spend so much time, hours, I mean hours, to try to get me out of this mess. I used to go to Albany. They used to come to my house. I used to tell both of them and I will tell in front of you I'm going to be your friend the rest of my life. Anything you need from me, you can count on me, because I appreciate everything you have done for me. That's the type of person I am. That's why my --

I came to this country when I was 25 years old. I start working factory, pumping gas at the gas station, cleaning, cleaning buildings, factory, grocery store, supermarket, parking lot. You name it, I did it. I never deal drugs because that's not my nature. I never did nothing wrong because I don't think that my life, the way I was bought up, that doing dirty stuff was going to help me. I don't like jewelry. I don't have fancy cars. I don't have money in the bank. Nothing. I had a 2002 Town & Country Chrysler. Scratch all over the place. I don't have apartment -- I don't have apartment the way (INDISCERNIBLE). I own the house because I inherit it because my mother and my father died. I don't want the house. I would rather (INDISCERNIBLE).

I don't want to say anything else, you know, because I -- I'm sorry.

THE COURT: Okay. Thank you, sir.

In imposing sentence today, I have carefully looked at all of the pertinent information, as I've said. I have spent a significant amount of time analyzing the 3553(a) factors that one must carefully consider in any sentencing.

There's no doubt in my mind that this defendant has done a number of positive things in his community. All of the letters that I have received on his behalf bear that out. I don't doubt that he loved his job. And I don't doubt that he did many things in a very positive fashion at his job as a clerk for the Court.

But somewhere along the line, Mr. Figueroa, you crossed a line. You went from being an honest, hard-working public servant to someone who was willing and who did accept money, accept bribes, for referring poor people to an attorney that they would have to pay. And there was ample testimony during the trial that that's what you did. And there was testimony that you told indigent individuals that hiring a private attorney would be better than having a public defender.

And the irony of it is here you are sitting between two of the best public defenders that could ever walk the earth. And all of the public defenders involved in the Northern District, the Southern District, the Eastern District and the Western District of New York, from my observation, they've always been in it for all of the right reasons and that is to give everybody the best defense possible they can have

when they are accused of a crime. But you encouraged people to not have the public defenders or CJA counsel.

I don't doubt that you referred people to a very competent attorney, Mr. Del Valle, but you weren't allowed to do that and you knew it. I know that you knew, as a public servant, as a clerk in the District Court of the Southern District of New York, you had no right to hint, to refer, to suggest to people who they should retain as attorneys. And by doing what you did, you took people who qualified to have counsel provided them at the cost of the government, free to them, and you put them in a situation where some of them ended up having to pay for representation. And I'm sure that many of these people clearly did not have the money to do that.

And the thing is, Mr. Figueroa, I know from the witnesses who testified from the court system that, you know, you do have a large personality. You do have a sense of humor. You do have a way of making people like you. But it doesn't matter if you have a large personality and you're well liked, because when people were not looking, you were doing the wrong thing.

And as I said during the sentencing of Mr. Del Valle, this is a hard crime to detect. The mere fact that it went on for about 10 years I think is indicative of how difficult this crime is to detect. So when people were looking, yes, you were jovial, you were helpful, you were using your dual-language

abilities to help people. That's unquestioned by me. But when people were not looking, you were doing the wrong thing. And our court system depends on trustworthiness. It depends on people doing the right thing even when people are not looking.

And you should know that you did absolutely, unquestionably break the law with what you did. You may not have become a millionaire by taking bribe money from Mr. Del Valle. You may not have bought expensive yachts or expensive homes. But that's how crime works. You get greedy. Every little bit helps. You take whatever you can have come your way. And the sight of an attorney's office stuffing dollar bills in envelopes and having your lover pick up the dollar bills and bring them to you is wrong, wrong and wrong. It just is. And it just reflects so poorly on all of the hard-working members of the Federal Courts and the Federal Court in the Southern District in particular because there are so many good, trustworthy public servants. And at some point in your life, you became greedy. It became easy because you were, pretty much because of your personality and your set of skills, left to your own devices and you would slip Mr. Del Valle's name and number under your counter. You would say it to someone in Spanish and it went undetected. And it's a crime. And you committed several crimes by your conduct.

So, in fashioning a sentence for you and in looking at all of the 3553 factors and everything else that I've been

provided, I know that you did many, many positive things in your life, again, I don't doubt it, but I look at your crime, your breach of the trust of the public, as the most serious crime because courts of law stand for the exact opposite. We stand for trust. We hope that everybody who comes through the court system is treated with great respect and they're treated equally and that they receive justice. What you did is put the Court's reputation in peril.

I think that promoting respect for the law is very important in a sentence that I will meet out in just a few moments.

I do think that general deterrence is important because, again, court clerks and court personnel cannot have supervisors hovering over them every minute of the day. They have to believe that what their personnel know is right and just is being carried out every day. They have to assume that court personnel know and I know that you knew what you were doing was wrong. And you knew that from the materials that you had been provided upon your employment. And you absolutely knew that you could not refer individuals who came to Federal Court to a specific attorney. So I think that general deterrence is important. It is a difficult crime to detect. And I think others do have to realize that you will lose your liberty if you do something like this.

In terms of the amount of money and what you did with

it, I do believe the amount was in excess of $40,000. And what you did with it, you probably did what other people do with their money. You used it to make your life easier in any way that you could. You don't have to get rich to be guilty of the crimes that you committed.

Therefore, upon your plea of guilty to Counts One, Two and Seven of the indictment -- upon the jury's determination of your guilt to Counts One, Two and Seven of the indictment, it is the judgment of the Court that you are hereby committed to the custody of the Bureau of Prisons for a period of 24 months. I believe that this sentence is justified based upon a review of all of the 3553 factors.

Upon your release from imprisonment, you will be placed on supervised release for a term of one year on each count, each count to run concurrently.

You must abide by all of the standard conditions that have been set forth in the presentence investigation report.

And again, if I misspoke, the counts are One, Two and Six.

So you must apply with all the standard conditions that have been adopted.

With respect to the drug conditions, you must follow those conditions to the extent that you must not unlawfully possess a controlled substance. However, the drug-testing condition is suspended based upon the Court's determination

that you pose a low risk of future substance abuse.

With respect to the standard conditions, you must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment unless the probation officer instructs you to report to a different probation office within a different time frame.

After initially reporting to the probation office, you will receive instruction from the Court or the probation officer about how and when you must report to the probation officer and you must report to Probation as instructed.

You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the Court or the probation officer.

You must answer truthfully the questions asked by your probation officer.

You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements, such as the people you live with, you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

You must allow the probation officer to visit you at

any time at your home or elsewhere. You must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

You must work full-time, at least 30 hours per week, at a lawful type of employment unless the probation officer excuses you from doing so. If you do not have full-time employment, you must try to find full-time employment unless the probation officer excuses you from doing so. If you plan to change where your work or anything about your work, such as your position or your job responsibilities, you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

You must not own, possess or have access to firearms,

ammunition, destructive devices or dangerous weapons or anything that was designed or was modified for the specific purpose of causing bodily injury.

You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the Court.

You must follow the instructions of the probation officer relating to the conditions of supervision.

No special conditions of supervision are recommended since the defendant has no treatment needs.

And the imposition of restitution and a fine were not recommended by Probation and the Court adopts that recommendation.

If you are sentenced to any period of supervision, and you have been, it is recommended that you be supervised by the district of your residence.

It is further ordered that you must pay to the United States a special assessment of $300, which is due and payable immediately.

With respect to the forfeiture, I believe I have already signed the order of forfeiture.

Based upon your loss of employment and your limited income, the Court is not imposing a fine.

In light of your adjustment to supervision pending sentencing, I do believe that you are an appropriate candidate

for voluntary surrender.

The defendant has kept all court appearances and has been in compliance with all terms of the conditions of his supervised release. I do not view Mr. Figueroa as a flight risk or a danger to the community.

Mr. Figueroa must report on May 14th by 2 p.m. as designated by the Bureau of Prisons.

Both parties have the right to appeal this sentence in certain circumstances.

You are advised to consult with your attorneys, Mr. Figueroa, to determine whether or not an appeal is warranted. Any appeal must be filed within 14 days of the date judgment is filed in this case.

Is there anything further from the government?

MR. BALSAMELLO: No, Judge. Thank you.

THE COURT: Is there anything further from the defense?

MR. EVANGELISTA: No, Judge.

THE COURT: Court stands adjourned.

----